**UNITED STATES DISTRICT COURT**

**DISTRICT OF CONNECTICUT**

**LEONA WILLIAMS, ADMINISTRATRIX CARNELL WILLIAMS** ***Plaintiff***

**CIVIL ACTION 3:16CV1131(WWE)**

**V.**

**CITY OF BRIDGEPORT; JOSEPH L. GAUDETT, JR., Individually and as former Bridgeport Police Chief CHRISTOPHER BORONA, Individually and as a Detective of the Bridgeport Police Department; JASON AMATO, Individually and as a Sargent of the Bridgeport Police Department; JAMES BORRICO, Individually and as a Detective of the Bridgeport Police Department; SEAN RONAN, Individually and as a Detective of the Bridgeport Police Department; EVERTON WALKER, Individually and as a Officer of the Bridgeport Police Department DENNIS MARTINEZ, Individually and as a Detective of the Bridgeport Police Department,** ***Defendants***

**SEPTEMBER 12, 2016**

**<u>AMENDED COMPLAINT</u>**

## PRELIMINARY STATEMENT

1. Having been appointed Administratrix by the Connecticut Probate Court, District of Bridgeport, Plaintiff Melissa Gibbs is the mother of Carnell Williams and personal representative of the Estate of Carnell Williams; she brings this action on behalf of her son's estate pursuant to Connecticut General Statutes § 52-599 (Survival of Cause of Action) and § 52-555 (Action for Injuries Resulting in Death).

2. Plaintiff's Decedent is Carnell Williams, whose wrongful death is the subject of this litigation; he was a resident of the City of Bridgeport at the time of his death.

3. At the time his death on November 25, 2013, Carnell Williams was in good health and had just celebrated his twenty third (23rd) birthday five days earlier. At the time of his death, Carnell Williams was the father of Jae'onnah Aaliyah McCrae and Shamiya Catherine Williams and the expectant father of an unborn son.

4. Defendant City of Bridgeport is a municipal corporation organized and existing under the laws of the State of Connecticut.

5 At all relevant times herein, Defendant Joseph L. Gaudett, Jr. was the Police Chief of Defendant City of Bridgeport Police Department, and was acting in the

performance of his duties and within the scope of his employment and authority as Police Chief for the City. As such, Defendant Gaudett acts under color of state law.

6. Defendant Jason Amato is employed by Defendant City of Bridgeport as Sergeant in its police department, and was, at all relevant times, acting in the performance of his duties and within the scope of his employment and authority as a police officer for the City. As such, Defendant Amato acts under color of state law.

7. Defendant Christopher Borona is employed by Defendant City of Bridgeport as a Detective in its police department, and was, at all relevant times, acting in the performance of his duties and within the scope of his employment and authority as a police officer for the City. As such, Defendant Borona acts under color of state law.

8. Defendant James Borrico is employed by Defendant City of Bridgeport as a Detective in its police department, and was, at all relevant times, acting in the performance of his duties and within the scope of his employment and authority as a police officer for the City. As such, Defendant Borrico acts under color of state law.

9. Defendant Sean Ronan is employed by Defendant City of Bridgeport as a Detective in its police department, and was, at all relevant times, acting in the performance of his duties and within the scope of his employment and authority as a

police officer for the City. As such, Defendant Ronan acts under color of state law.

10. Defendant Everton Walker is employed by Defendant City of Bridgeport as a police officer, and was, at all relevant times, acting in the performance of his duties and within the scope of his employment and authority as a police officer for the City. As such, Defendant Walker acts under color of state law.

11. Defendant Dennis Martinez is employed by the City of Bridgeport as a Detective in its police department, and was, at all relevant times, acting in the performance of his duties and within the scope of his employment and authority as a police officer for the City. As such, Defendant Martinez acts under color of state law.

12. On November 18, 2013, a confidential informant relayed to Defendant Amato that his cell mate in Bridgeport Correctional Center, who was a suspect in a Norwalk shooting, wanted to sell some handguns to make money for his bond.

13. Defendant Amato thereafter coordinated with the confidential informant who was orchestrating the undercover purchase of firearms through a then unidentified female named “Kiki” who was connected to his cell mate through the cell mate’s sister. Two guns, a 9mm and .38 Revolver, were to be purchased for $750.00. Kiara Davis, also known as “Kiki” backed down from the scheduled undercover firearm sale on

November 18, 2013 because she was unable to confirm the sale with the gun owner since Bridgeport Correctional Institute was in lock-down.

14. On November 25, 2013, beginning at approximately 5:00 p.m., Ms. Davis contacted Defendant Walker by text and stated that she was ready to sell the guns. Multiple text messages then ensued between Defendant Walker and Ms. Davis surrounding the set up and meet to sell the guns. Defendant Walker then contacted Defendant Amato about the deal who provided him with the go-ahead to set it up.

15. Originally, the meet was to take place at the McDonald's parking lot near the State Street Exit, a public setting where many individuals and families would likely be vulnerable. Ms. Davis then texted Defendant Walker to change the location to Went Field Park in Bridgeport. Defendant Amato decided to decline the new location because of the poor lighting, to which Defendant Walker agreed. Defendant Walker informed Ms. Davis that he wanted an area where there were people and better lighting because he did not want to get robbed, despite the fact that an area where there were people would put the public's safety at significant risk.

16. At approximately 5:30 p.m. on November 25, 2013, Defendant Walker, after consultation with Defendant Amato, agreed with Ms. Davis to meet at 6:30 p.m.

that same night at the Bridgeport Boston Avenue Burger King/shopping center parking lot, a public setting where many individuals and families would likely be vulnerable.

17. On November 25, 2013, at approximately 6:00 p.m., Defendant Amato contacted Bridgeport police Captain Viadero and requested assistance from the Bridgeport Detective Bureau for an undercover operation. Defendant Borrico, who had already agreed to be of assistance, thereafter contacted Defendant Ronan who also agreed to assist. While en-route to the briefing in an unmarked car with Defendant Borrico and Detective Martinez, Defendant Ronan called Defendant Borona, who was then under investigation for the use of deadly force against Bryan Stukes which Defendant Ronan knew, and Detective Fumidinisi, both of whom also agreed to assist Defendants Amato and Walker in the undercover operation.

18. Shortly after 6:00 p.m. on November 25, 2013, Defendant Amato and Defendant Walker, as Bridgeport police members of the local Connecticut State Police Statewide Urban Violence Cooperative Crime Control Task Force, Gangs Unit (Gang Task Force) thereafter assembled the following individuals for a briefing on the undercover operation with “Kiki” that was scheduled for 6:30 p.m. that same night: State Police Task Force members Detective David Edwards and Corrections Officer

Rene Figueroa; and Bridgeport Detective Fumidinisi and Defendants Borona. Borrico, Martinez and Ronan.

19. During the undercover briefing, Defendant Amato advised that a female seller was bringing two firearms to sell for $750.00 to Defendant Walker, who was acting undercover as the potential buyer, at the Burger King located at Bayview Plaza on Boston Avenue, despite the fact that this was a public setting where the safety of many individuals and families would likely be vulnerable.

20. During the undercover briefing, Defendant Amato further advised "[d]ue to the fact that 'Kiki' was still not identified and further information came in that one of the firearms may have been used by Samuel DeJesus in a shooting in Norwalk, the plan was to arrest her immediately after [Defendant] Walker saw one of the firearms. . . . [Defendant] Walker was provided with $750.00 cash (SUVCCCTF Case Funds) as a flash roll, this was only for show not to purchase the firearms. [Defendant] Walker was instructed by Sgt. Amato where to park in the Burger King lot and once he saw one or both firearms, the take down signal was removing his knit cap." (Defendant Amato's Statement to Captain Viadero, Bridgeport Detective Bureau, dated December 17, 2013, Paragraph 3, p.1, which statement was provided *22 days after* the undercover sting

operation ended in the death of Carnell Williams, Plaintiff's Decedent).

21. During the undercover briefing, Defendant Amato further advised that "Kiki" might be accompanied by an African American male, known as "Nay Nay," who she was "reluctant to bring because she thought if she bought him there might be problems because he was 'crazy'."

22. Ms. Davis had solely provided the information that she might be accompanied by an African American male, Plaintiff's Decedent, who she was reluctant to bring because he might cause problems as he was "crazy," not because that statement was true, but as a means of ensuring her own protection given that she was negotiating with a man unknown to her, that is Defendant Walker who was acting as the undercover buyer.

23. Defendants Amato and Walker made sure that those briefed for the first time with less than a half hour until the scheduled undercover operation, including Defendants Borona, Borrico, Ronan and Martinez, were fully cognizant that "Nay Nay" was "crazy" and might be accompanying "Kiki" to the planned undercover gun buy.

24. Despite this added information that "Kiki" might be accompanied by a "crazy" African American male and that one of the guns might have been used in a

Norwalk shooting, both of which necessarily raised the danger quotient, Defendants Amato and Walker made no revisions to their planned undercover operation, such as securing the guns by having Defendant Walker actually complete the sale before the police moved in for an arrest, or establishing a signal to call off the undercover operation if conditions changed, and instead continued their plan that the undercover operation was to take place with firearms left on the persons to be arrested in a public setting, thus knowingly, intentionally, recklessly and maliciously putting the public, including Plaintiff's Decedent, at risk.

25. Despite this added information that "Kiki" might be accompanied by a "crazy" African American male and that one of the guns might have been used in a Norwalk shooting, both of which necessarily raised the danger quotient, Defendants Borona, Borrico, Ronan and Martinez failed to request revisions from Defendants Amato and Walker to their planned undercover operation, such as securing the guns by having Defendant Walker actually complete the sale before the police moved in for an arrest or establishing a signal to call off the operation if conditions changed. By acquiescing in the plan that the undercover operation was to take place in a public setting, without any revisions, Defendants Borona, Borrico, Ronan and Martinez thus knowingly,

intentionally, recklessly and maliciously put the public, including Plaintiff's Decedent, at risk.

26. Defendant Walker was in a silver Mercedes; Defendant Amato was in an unmarked silver Chrysler, with Corrections Officer Figueroa along as another set of eyes and State Police Detective Edwards; Defendants Borrico and Ronan, with Detective Martinez were in an unmarked black Lincoln; Defendant Borona with Detective Fiumidinisi was in a white Tahoe.

27. Defendant Amato instructed Bridgeport police officers involved in this undercover operation, including Defendants Walker, Borona, Borrico, Ronan and Martinez that his vehicle would be the take down vehicle with others as back-up.

28. As Defendants Amato, Walker, Borona, Borrico, Ronan and Martinez were driving to the planned location, Ms. Davis called Defendant Walker, telling him that she was in the Burger King Parking lot and driving a black Honda. This information was passed on to all Bridgeport police officers involved.

29. Because the unmarked police vehicles took up positions at the Burger King/shopping center parking lot at approximately 6:20 p.m., the briefing by Defendants Amato and Walker could have been no more than fifteen minutes in duration, and likely

much less. The immediacy of the briefing in relation to the planned undercover operation, its limited duration, and the failure to establish a signal to abort the planned cover operation should something unanticipated occur contributed to endangering the public, thus knowingly, intentionally, recklessly and maliciously putting the public, including Plaintiff's Decedent, at risk.

30. The Bridgeport police were in contact with each other utilizing Bridgeport events channel #6; State police Detective Edwards and State Police Sargent Kenney utilized a separate radio for communication.

31. Defendant Walker radioed that the target was on site and paying for food in the Burger King; Defendant Amato's position allowed him to view the Burger King interior and reported that no one matching "Kiki's" description was inside the Burger King.

32. Defendant Walker parked as instructed by Ms. Davis and waited for "an extended period" for her to approach his vehicle. During this "extended" interval, Defendant Walker made several attempts to contact Ms. Davis, but she failed to respond. .

33. Despite the deliberate disinformation as to her location inside Burger King,

and the "extended" period when Ms. Davis failed to respond to Defendant Walker's multiple attempts at contact, Defendants Amato and Walker made no adjustments to the planned undercover operation, such as securing the guns by completing the buy before moving in for the arrest, or cancelling the operation entirely because the changing circumstances enhanced the potential for danger in this public setting, thereby knowingly, intentionally, recklessly and maliciously putting the public, including Plaintiff's Decedent, at risk.

34. Despite the deliberate disinformation as to her location inside Burger King, and the "extended" period when Ms. Davis failed to respond to Defendant Walker's multiple attempts at contact, Defendants Borona, Borrico, Ronan and Martinez failed to advise Defendants Amato and Walker to make adjustments to the planned undercover operation, such as securing the guns by completing the buy before moving in for the arrest, or cancelling the operation entirely because the changing circumstances enhanced the potential for danger in this public setting, thereby knowingly, intentionally, recklessly and maliciously putting the public, including Plaintiff's Decedent, at risk.

35. Defendant Walker thereafter moved his vehicle to a different location in the Burger King/shopping center parking lot, informing the other Bridgeport police

officers, including Defendants, via channel #6 that “Kiki” was present and asked him to move his car and shut off his lights.

36. Ms. Davis was in the driver seat of a gold Nissan Altima; Carnell Williams, Plaintiff’s decedent, was in the passenger seat.

37. After moving his vehicle, Defendant Walker noticed a black Honda Civic driving by his location and was unsure if this was “Kiki’s” car. Defendant Walker asked his police team to make note of the black Honda, which at this point had left his immediate area.

38. At this juncture, Defendant Walker reported that he had “concerns about ‘Kiki’s’ actions because she was putting herself in control of the situation and seemed to be ‘stalking’ [him] because she could see [him] but [he] could not see her. This made [Defendant Walker] think that ‘Kiki’ might be trying to set [him] up to rob him for gun money or otherwise harm [him]. She was also asking [him] to move locations and this made it more difficult for other officers to provide cover for [him].” (Defendant Walker’s Statement to Captain Viadero, Bridgeport Detective Bureau, dated December 13, 2013, Last Paragraph, p. 2, which statement was provided *18 days after* the undercover sting operation ended in the death of Carnell Williams, Plaintiff’s Decedent).

39. Despite Defendant Walker's increased concerns about the dangers this undercover operation in a public setting now presented, Defendants Amato and Walker failed to make any adjustments to their planned undercover operation, including calling it off as too risky under existing circumstances and/or securing the firearms by completing the buy before moving in for the arrest, thereby knowingly, intentionally, recklessly and maliciously putting the public, including Plaintiff's Decedent, at risk.

40. Despite Defendant Walker's increased concerns about the dangers this undercover operation in a public setting now presented, Defendants Borona, Borrico, Ronan and Martinez failed to advise Defendants Amato and Walker to make any adjustments to their planned undercover operation, including calling it off as too risky under existing circumstances and/or securing the firearms by completing the buy before moving in for the arrest, thereby knowingly, intentionally, recklessly and maliciously putting the public, including Plaintiff's Decedent, at risk.

41. Although Defendant Amato had issued instructions that his vehicle was to be the take down lead, he instead kept his vehicle in its original location watching two Hispanic males in a black Honda who might have been acting as look-outs for "Kiki" and ordered the other vehicles to move in positions to watch Defendant Walker at his new

location; despite the fact that his vehicle positioned to watch Defendant Walker at his new location, Defendant Amato never issued an order that another vehicle should assume the take down lead.

42. Despite the fact that Ms. Davis had not arrived in a black Honda as she had proffered; that she had lied about being inside the Burger King; that the police had added concerns that two Hispanic males in a black Honda were acting as her look-out, thereby raising the number of potential individuals subject to arrest; that Defendant Amato was no longer in a position to act as the take down lead as was previously planned and without a back-up plan for a secondary take down lead; and that this was a public setting at the dinner hour, Defendants Amato and Walker failed to make any adjustments to their planned undercover operation, including calling it off as too risky under existing circumstances and/or securing the firearms by completing the buy before moving in for the arrest, thereby knowingly, intentionally, recklessly and maliciously putting the public, including Plaintiff's Decedent, at risk.

43. Despite the fact that Ms. Davis had not arrived in a black Honda as she had proffered; that she had lied about being inside the Burger King; that the police had

added concerns that two Hispanic males in a black Honda were acting as her look-out, thereby raising the number of potential individuals subject to arrest; that Defendant Amato was no longer in a position to act as the take down lead as was previously planned and without a back-up plan for a secondary take down lead; and that this was a public setting at the dinner hour, Defendants Borona, Borrico, Ronan and Martinez failed to advise Defendants Amato and Walker to make any adjustments to their planned undercover operation, including calling it off as too risky under existing circumstances and/or securing the firearms by completing the buy before moving in for the arrest, thereby knowingly, intentionally, recklessly and maliciously putting the public, including Plaintiff's Decedent, at risk.

44. Defendant Walker then observed a gold colored Nissan Altima with its lights on and engine running in the parking space in front of his new location; that car drove away but pulled into the same spot moments later, parking next to a civilian van. Defendant Walker notified his police team that he believed this was the suspect vehicle and not the black Honda. Ms. Davis contacted Defendant Walker at this juncture asking him to turn off his head lights. Defendant Walker complied but informed Ms. Davis that he would be leaving "because [he] was not comfortable and she appeared to be playing

[him] for a fool." (Defendant Walker's Statement to Captain Viadero, Bridgeport Detective Bureau, dated December 13, 2013, Second full Paragraph, p. 2).

45. Despite the fact that Ms. Davis had parked next to a civilian van; that Defendant Walker was uncomfortable with Ms. Davis having asserted control over the undercover operation and told her that he would be leaving, which would have allowed sufficient time for this undercover operation to regroup on another occasion under safer circumstances, including adding a no-go signal and modifying the plan to purchase the firearms prior to moving in for the arrest, Defendants Amato and Walker failed to make any adjustments to their planned undercover operation, including calling it off as too risky under existing circumstances and/or securing the firearms by completing the buy before moving in for the arrest, thereby knowingly, intentionally, recklessly and maliciously putting the public, including Plaintiff's Decedent, at risk.

46. Despite the fact that Ms. Davis had parked next to a civilian van; that Defendant Walker was uncomfortable with Ms. Davis having asserted control over the undercover operation and told her that he would be leaving, which would have allowed sufficient time for this undercover operation to regroup on another occasion under safer circumstances, including adding a no-go signal and modifying the plan to purchase the

firearms before moving in for the arrest, Defendants Borona, Borrico, Ronan and Martinez failed to advise Defendants Amato and Walker to make any adjustments to their planned undercover operation, including calling it off as too risky under existing circumstances and/or securing the firearms by completing the buy before moving in for the arrest, thereby knowingly, intentionally, recklessly and maliciously putting the public, including Plaintiff's Decedent, at risk.

47. Like Defendant Walker, Defendant Borona also expressed "added concern" that the female seller was stalling the buy and concealing her identify by not providing an accurate description of the vehicle she was driving and misrepresented her location by claiming she was in Burger King purchasing food. (Defendant Borona's Statement to Captain Viadero, Bridgeport Detective Bureau, dated December 19, 2013, Third Paragraph, p. 1, which statement was provided *24 days after* the undercover sting operation ended in the death of Carnell Williams, Plaintiff's Decedent).

48. Despite these added concerns, particularly given the public setting of this undercover operation, Defendant Borona failed to advise Defendants Amato and Walker that they should revise their plan accordingly and either postpone the operation to another time or secure the weapons from the female seller by completing the buy before

police moved in for an arrest, and thereby knowingly, intentionally, recklessly and maliciously putting the public, including Plaintiff's Decedent, at risk.

49. While still talking to Ms. Davis on the phone, Defendant Walker walked up to the passenger window of the car that she was driving. Defendant Walker then hung up the phone so that Ms. Davis would have to roll down the windows in order to communicate with him.

50. After lowering the passenger window down half-way and in response to Defendant Walker's question about the guns, Plaintiff's decedent then reached down into a small backpack on the floor and retrieved a gun to display to Defendant Walker so that Ms. Davis could complete the sale. Defendant Walker "observed [Plaintiff's Decedent] bring a very large revolver type weapon up to about the height the dashboard. He was holding the revolver by the handle with the muzzle pointing down." (Defendant Walker's Statement to Captain Viadero, Bridgeport Detective Bureau, dated December 13, 2013, Second Paragraph, p. 3).

51. Despite the fact that the revolver's muzzle was pointing down; that it was very dark outside as it was approximately 6:45 p.m after daylight saving time ended.; and that the lighting was poor, Defendant Walker claimed, "[from where [he] was standing

[he] could see the rear of the cylinder and [he] noticed that there were bullets inside the weapon. Based on [his] observations [he] believed the gun was loaded." (Defendant Walker's Statement to Captain Viadero, Bridgeport Detective Bureau, dated December 13, 2013, Second Paragraph, p. 3, which statement was provided *18 days after* the undercover sting operation ended in the death of Carnell Williams, the Plaintiff's Decedent).

52. Evidence secured at the crime scene revealed that neither the Ruger .357 Magnum revolver that Plaintiff's decedent had removed from the backpack by his feet to show Defendant Walker and had left in the Altima on the front seat, nor the Smith & Wesson .38 Special revolver found in the backpack were loaded.

53. Defendant Walker then walked away, telling Ms. Davis that he was going to his car to get the money. As he moved away from her vehicle, Defendant Walker gave the only prearranged signal that guns were present by removing his hat. Defendant Walker thereafter role played by the passenger side of his vehicle that he was counting the $750.00 flash money.

54. If indeed Defendant Walker believed that the gun displayed to him was loaded and that "Kiki" had brought "crazy" "Nay,Nay" who might cause problems for

protection, particularly given the fact that the Burger King/strip mall parking lot was a public setting necessarily placing families and individuals, including Plaintiff's decedent at risk, then Defendant Walker should have delayed providing the agreed upon take down signal and instead should have first communicated this information to Defendant Amato over channel #6 so that Defendants Amato and Walker could change their plan of operation, informing the other police present, to have Defendant Walker actually purchase the guns with the $750 he had in his possession so that there would be no loaded weapons, or any weapons of any kind, in Ms. Davis' vehicle when the police team moved in for the arrest. By failing to amend their undercover operation given this additional information, Defendants Amato and Walker knowingly, intentionally, recklessly and maliciously put the public, including Plaintiff's Decedent, at risk.

55. Because Defendant Walker was talking at the Altima's passenger window, based on the briefing, Defendants Amato, Borona, Borrico, Ronan and Martinez were operating with the knowledge that "Kiki" had brought "Nay,Nay" who might cause unexpected problems because he was "crazy," particularly given the fact that the Burger King/strip mall parking lot was a public setting necessarily placing families and individuals, including Plaintiff's decedent at risk.

56. Based on confirmation that “Nay, Nay” was indeed present, Defendants Amato, Borona, Borrico, Ronan and Martinez should have consulted with each other and Defendant Walker once he was at his own vehicle, advising a change in plan, to have Defendant Walker return to the Altima and actually purchase the guns with the $750 he had in his possession so that there would be no loaded weapons, or any weapons of any kind, in Ms. Davis’ vehicle when the police team moved in for the arrest. By failing to amend the undercover operation given this additional information, Defendants Amato, Borona, Borrico, Ronan and Martinez knowingly, intentionally, recklessly and maliciously put the public, including Plaintiff’s Decedent, at risk.

57. Upon seeing Defendant Walker remove his hat, the take down signal, Detective Fiumidinisi drove through the shopping center parking lot, drove past the suspect vehicle and positioned the rear half of the Tahoe perpendicular and directly in front of the gold Altima. Defendant Amato drove his vehicle directly behind the gold Altima. Defendant Martinez drove the black Lincoln, positioning its front bumper behind the Altima’s rear bumper to block its path of travel; when he saw the Altima’s brake lights on, Defendant Martinez had the Lincoln make contact with the Altima.

58. The windows of the Altima were darkly tinted and closed; Ms. Davis did not

see or hear any police officer or vehicle, but felt and heard what she believed was a vehicle striking her from behind.

59. At no time prior to Defendants Walker, Borona, Borrico and Ronan discharging their weapons, did Ms. Davis or Plaintiff's Decedent brandish a firearm or point a firearm in their direction.

60. State Police Detective Edwards, who was in the vehicle with Defendant Amato, and approached the rear of the Altima with his gun drawn, reported that "he was unable to see into the interior compartment of the Altima due to its tinted windows." State Police Detective Edwards did not discharge his weapon because he was "unable to determine whether any of the gunfire was coming from within the vehicle or who was in the vehicle."

61. Defendant Amato stated that he could not see the interior of the Altima because of the dark tint on the rear window. Defendant Amato did not discharge his weapon.

62. Defendant Martinez approached the Altima from the rear, noting that the windows were tinted and closed. Defendant Martinez did not discharge his weapon.

63. Bridgeport Police Detective Fiumidinsi, who had been in the Tahoe with

Defendant Borona, could not see inside the driver's side window because the windows were heavily tinted and thus could not see if there was any threat from any person in the Altima. Detective Fiumidinsi did not discharge his weapon.

64. Defendants Borrico and Ronan, both of whom discharged their weapons, were the only officers to claim that the Altima headlights bounced off the Tahoe, illuminating the interior.

65. Neither Defendants Amato, Walker, Borona or Martinez, nor State Police Detective Edwards, nor Corrections Officer Figueroa nor Detective Fiumidinisi reported that the Altima's interior was illuminated because its headlights were bouncing off the Tahoe. (See, State police statements of Detective David Edwards and Corrections Officer Figueroa; Statements submitted to Captain Viadero by Defendants Amato, Walker, Borona, and Martinez; Statements submitted to Captain Viadero by Detective Fiumidinisi).

66. With their weapons drawn, Defendants Borrico, Borona and Ronan moved to the passenger side of the Altima.

67. After the undercover police vehicles had approached the Altima, and officers had exited their vehicles, Defendant Walker moved toward the rear of the Altima.

Defendant Walker alleges that he "yelled to the officers that it was the passenger that had the gun and it was loaded. [He] then heard someone yell 'he got the gun in his hand.'" (Defendant Walker's Statement to Captain Viadero, Bridgeport Detective Bureau, dated December 13, 2013, Third Paragraph, p. 3).

68. Neither the state police officers present, nor the Corrections officer present nor any of the other Bridgeport police officers present, including the other named Defendants, heard Defendant Walker yell out that the gun was loaded. (See, State police statements of Detective David Edward, Sargent Robert Kenney and Corrections Officer Figueroa; Statements submitted to Captain Viadero by Defendants Amato, Borona, Ronan, Borrico and Martinez; Statements submitted to Captain Viadero by Detective Fiumidinisi, and Officer Matrocchia (K9-2)).

69. Defendants Borona, Walker and Martinez all claim that initially they heard an isolated, "single gunshot," after which multiple gunshots contemporaneously erupted. (Defendant Borona's Statement to Captain Viadero, Bridgeport Detective Bureau, dated December 19, 2013, Second Full Paragraph, p. 2; Defendant Walker's Statement to Captain Viadero, Bridgeport Detective Bureau, dated December 13, 2013, Carryover Paragraph, p. 4; Defendant Martinez's Statement to Captain Viadero, Bridgeport

Detective Bureau, dated December 13, 2013, Carryover Paragraph, p. 3, which statement was provided *18 days after* the undercover sting operation ended in the death of Carnell Williams, Plaintiff's Decedent).

70. Defendant Borona, who fired 8 rounds from his Smith & Wesson .45 revolver and Defendant Walker, who stated that he fired "several rounds" but forensics found that he only fired twice, both contend that they did not start shooting until after they separately heard the isolated, single gunshot.

71. Defendant Martinez did not discharge his weapon, but conspired with Defendants Borona and Walker in claiming that initially there was a single, isolated gunshot so that the Defendants could deliberately shift blame away from themselves onto either Ms. Davis or Plaintiff's Decedent.

72. Neither the State Police Detective nor the State Police Sergeant present, nor the Corrections officer present nor the Bridgeport police officers present who have not been named as defendants, nor Defendants Borrico and Amato reported in their written statements that they heard an isolated, single gunshot. (See, State police statements of Detective David Edwards, Sargent Robert Kenney and Corrections Officer Figueroa; Statements submitted to Captain Viadero by Defendants Amato, Borona,

Ronan, Borrico and Martinez; Statements submitted to Captain Viadero by Detective Fiumidinisi, and Officer Matrocchia (K9-2)).

73. The two State police officers present did not discharge their weapons.

74. None of the members of the Bridgeport Police Department who discharged their weapons, that is Defendants Borona, Walker, Borrico and Ronan, admitted to being the individual who allegedly fired the isolated, single gunshot claimed by Defendants Borona, Walker and Martinez.

75. No one conducting any investigation into this use of deadly force against Plaintiff's Decedent questioned Defendants Borona, Walker, Borrico or Ronan as to who, if indeed it transpired, fired this single, isolated gunshot.

76. Upon information and belief, Defendant Walker fired two rounds; Defendant Ronan fired six rounds; Defendant Borora fired seven rounds; and Defendant Borrico fired nine rounds. All these rounds were aimed at Ms. Davis and/or the Plaintiff's Decedent while they were seated in the Altima.

77. Ms. Davis sustained a gunshot wound to her head, which exited through her nose; she then attempted to drive the vehicle away from the area to save herself; after a short distance, her vehicle was stopped by the parking lot curb.

78. State Police Sargent Kenny reported that approximately ten seconds lapsed between the time that the Altima moved forward and it came to rest on a parking curb.

79. At this juncture, Plaintiff's Decedent, who had sustained several gunshot wounds, got out of the Altima from the passenger side where he had been sitting, began to run and fell to the ground, face forward; Plaintiff's Decedent was unarmed as he exited the vehicle.

80. As he saw Plaintiff's Decedent, who had been shot numerous times, exit the Altima, Bridgeport Police Officer Martocchio released his K-9, which apprehended Plaintiff's Decedent by biting his right calf as he was lying unarmed on the ground.

81. Defendant Borona had been discharging his weapon from the passenger side of the Altima; when the Altima began to move forward, Defendant Borona followed in pursuit on foot. As he ran toward the Altima, Defendant Borona could see Plaintiff's Decedent exit the vehicle and knew that Plaintiff's Decedent was unarmed.

82. Knowing that Plaintiff's Decedent was unarmed and lying on the ground injured from various gunshots, Defendant Borona again discharged his weapon from 20 feet away, shooting Plaintiff's Decedent in the back just as the K-9 was about to

apprehend Plaintiff's Decedent.

83. As a direct and proximate result of the aforementioned events, Plaintiff's Decedent sustained the following extreme and fatal injuries:

(A) a perforating gunshot wound to his mid-back that entered his right pleural cavity and perforated both the lower and upper lobes of his right lung, exiting through the upper right chest wall;

(B) a perforating gunshot wound of the left lower back that traveled along the posterior chest wall and exited at the upper left back/medial shoulder;

(C) a penetrating gunshot wound of the posterior right shoulder that fractured the right humeral head;

(D) a perforating gunshot wound of the upper right arm, perforating the muscles and exiting at the medial inner upper right arm;

(E) a penetrating gunshot wound of the posterior right hand near the wrist at the base of the thumb;

(F) dog bite marks on his lower right leg as exhibited by a 2 inch defect, two paired ½ inch defects and scattered adjacent punctate and irregular 1/4 to ½ inch abrasions.

84. The injuries sustained by Plaintiff's Decedent, Carnell Williams, resulted in his untimely death, after excruciating pain and mental anguish, approximately one and one half hours after having been shot numerous times.

85. Since 2004, there have been seven incidents of deadly force by members of the Bridgeport Police Department, including Plaintiff's Decedent. Despite the fact that there were at least 300 or more members of Bridgeport's Police Department in each of these intervening years, Defendant Amato was involved in two uses of deadly force in addition to Plaintiff's Decedent for a total of three (3) out of seven (7); Defendant Borona was under investigation at the time of this deadly shooting for another use of deadly force for a total of two (2) out of seven (7); Defendant Borrico was involved in one other deadly shooting for a total of two (2) out of seven (7). Of the seven uses of deadly force since 2004, Defendants Amato and Borrico were each involved in the same deadly shooting twice: Plaintiff's Decedent and one other victim.

86. Of the two uses of deadly force by Defendant Amato prior to his involvement in the death of Plaintiff's Decedent, one in September 2004 involved Defendant Amato and five other officers responding to a domestic disturbance in which the suspect had been described as intoxicated and trying to break down the door of his

former girlfriend's apartment; as the six officers walked down the hallway to confront the suspect Jonathan Mosely, Mr. Mosely, who was at first sitting on the ground, stood up and raised a baseball bat; Mr. Mosely then ran toward the six police officers. Instead of using a lesser means of force such as a Taser to stop Mr. Mosely from charging, three of the six police officers, including Defendant Amato, fatally shot him, while the other three officers did not discharge their service weapons.

87. At this juncture when he fatally shot Jonathan Mosely, Defendant Amato had been a Bridgeport police officer for less than four years; Defendant Amato would have benefitted, as would have the public he serves, including Mr. Mosely, had he received additional training and supervision in the use of less than deadly force.

88. On May 3, 2006, Defendant Amato, who was the driver of the police vehicle, accompanied by Defendant Borrico gave chase to a dark colored Ford Explorer driven by an African American male armed with a long rifle or pellet gun that had been involved in an attempted robbery; Defendants Amato and Borrico chased the suspect through a maze of residential streets; during the chase the suspect vehicle maintained speeds of forty to fifty miles per hour, was weaving from side to side, passing through clearly marked stop signs and street lights and forcing motor vehicles traveling in both

directions to pull off the road, putting the public in danger by the continued high speed chase; other police vehicles joined in, attempting to cut off the suspect's vehicle; at the Black Rock intersection, the Explorer narrowly missed another patrol car, but due to its speed crashed into the first parked vehicle on the right side of Black Rock Avenue; Defendant Amato parked his vehicle with the right side bumper up against the Explorer's driver-side door preventing the suspect from exiting; both Defendants Amato and Borrico exited their vehicle; the Explorer abruptly shifted in reverse, knocking Defendant Borrico to his knees; Defendant Amato then fired four rounds directly at the suspect as the Explorer was reversing north on Iranistan Avenue while Defendant Borrico also fired at the fleeing Explorer before the vehicle swerved off the road, coming to a stop against a chain link fence. The suspect, Jamar Marrow, died within minutes while still in the Explorer having been fatally shot by Defendant Borrico.

89. Defendants Amato and Borrico failed to exercise good judgment and intentionally and recklessly exercised bad judgment when they engaged in this high speed chase of an attempted robbery suspect through residential neighborhoods and across major city thoroughfares, which necessarily put the public at risk, including those cars traveling in both directions that were forced to swerve to avoid being hit by the

suspect's vehicle while it was being chased by Defendants Amato and Borrico.

90. Shooting at a moving vehicle on a public road, which both Defendants Amato and Borrico engaged in on May 3, 2006 is inherently dangerous to the public as shots taken by police officers at the drivers of moving vehicles often are not accurate and require the bullet to breach either a metal or glass barrier.

91. Particularly because at this juncture Defendants Amato and Borrico had the attempted robbery suspect's license plate and could have obtained a proper warrant for his arrest under conditions that would not put the general public at risk of injury by a high speed chase or flying bullets on a publically traveled road, their actions in continuing the high speed chase and discharging their weapons at a moving vehicle unnecessarily put the public at risk.

92. As both Defendants Amato and Borrico had only been Bridgeport police officers for five and one-half years when Defendant Amato fatally shot Jamar Marrow after engaging in a high speed chase and thereafter shooting at a moving vehicle on a public road, Defendant Amato and Borrico would have benefitted, as would the public they serve, had they received additional training and supervision in the risk to the public of engaging in high speed chases, and discharging their weapons at a moving vehicle in

a public road.

93. Defendant Borona has a history of misconduct as a police officer. The Second Circuit Court of Appeals determined that allegations by Christopher Russo that Borona willfully mishandled and suppressed exculpatory evidence would readily support a jury finding of either intentional violation of or deliberate indifference to, Mr. Russo's constitutional rights by Defendant Borona, and that Borona's conduct "shocks the conscience." See, Russo v. City of Bridgeport, 479 F.3d 196, 208-210 (2nd Cir. 2007). (Borona falsely described that contents of videotape claiming that perpetrator had tattooed arms when the arms had no tattoos whatsoever, attempted to evoke a confession from Russo who had significant tattoos on both arms by misrepresenting the very evidence of Russo's innocence that was available to Borona; Borona also testified under oath to such falsehoods; Russo spent 217 days in pre-trial detention because he could not make the bond set).

94. In view of the City of Bridgeport's affirmative admission that Defendant Borona had acted toward Russo "in accordance with custom, policy and practice," the Second Circuit Court of Appeals further determined that if Borona is ultimately held to have violated Russo's constitutional rights, then municipal liability against the City will be

appropriate as well for failing to train and supervise its officers in the handling of exculpatory evidence. Russo v. City of Bridgeport, 479 F.3d at 211-12.

95. Because Defendant City of Bridgeport thereafter paid Christopher Russo the sum of $250,000 to settle his civil rights lawsuit against Defendant Borona and another Bridgeport police officer, Defendant City of Bridgeport as well as Defendant Joseph Gaudett, at all relevant times Chief of the Bridgeport Police Department, were on notice since May of 2008 that Defendant Borona, while acting in his official capacity as a police officer, had engaged in deliberate deception that violated an individual's constitutionally protected due process rights.

96. Defendant City of Bridgeport and Defendant Gaudett as its Chief of Police never disciplined Defendant Borona for engaging in deliberate deception that violated Russo's due process rights, nor retrained him, nor provided added supervision, thus indicating ratification and acceptance of patterns, practices, customs and/or procedures of deliberate deception, and police misconduct that gravely undermines the community's trust in law enforcement and also has placed the community in harm's way, including two subsequent uses of deadly force.

97. Defendant City of Bridgeport as well as Defendant Chief of Police Gaudett

have also been put on notice, by virtue of the City's 2014 settlement with Orlando Lopez-Soto, of the importance of carefully reviewing videotape footage of incidents where police have used excessive force and comparing that videotape footage to ascertain the veracity, by commission or omission, of the incident report filed by the police officers involved. (Videotape showed officer tasering Lopez-Soto a second time after he was already incapacitated and two other officers then kicking and stomping on Lopez-Soto while he was incapacitated on the ground; police incident report failed to include any references to kicking and stomping).

98. At the time of Defendant Borona's involvement in this deadly use of force against Plaintiff's Decedent, he was under investigation for the deadly use of force against Bryan Stukes.

99. There is videotape footage from three different camera angles located at Golfinho's Fish Market of Defendant Borona's use of deadly force against Mr. Stukes.

100. Defendant Chief Gaudett permitted Defendant Borona to describe his use of deadly force eight days later in the form of a letter to Captain Viadero of the Bridgeport Detective Bureau. The Bridgeport police did not question Defendant Borona; the State Police at Troop G did not question him; neither did the State's Attorney for the Judicial

District of Stamford/Norwalk assigned to investigate Defendant Borona's use of deadly force against Mr. Stukes.

101. No member of the Bridgeport police department, nor the State Police at Troop G nor the State's Attorney for the Judicial District of Stamford/Norwalk assigned to investigate Defendant Borona's use of deadly force against Mr. Stukes, ever questioned Defendant Borona about the material discrepancies between his Statement dated April 8, 2013 to Captain Viadero and the videotape footage from the Fish Market, including that:

(A) Defendant Borona lied that Mr. Stukes pointed his unarmed .22 rifle at him;

(B) Defendant Borona lied that he fired two shots when he discharged his weapon three times;

( C) Defendant Borona lied that Mr. Stukes dropped his weapon after the second shot when instead Mr. Stukes dropped his weapon when he stumbled and fell after Defendant Borona's first shot caused the injuries to the right and left thighs of Mr. Stukes;

(D) Defendant Borona lied by omission because he necessarily had to have reloaded his gun to corroborate his previous lie about only firing two shots.

102. The Bridgeport Chief of Police is the policymaker in regards to training, policies and discipline, including firing officers. The Bridgeport Chief of Police approves all discipline of its officers.

103. Upon information and belief, neither Defendant City of Bridgeport nor Defendant Police Chief Gaudett have ever investigated why three members of the Police Department, Defendants Amato, Borona and Borrico, have been involved in four (4) of the seven (7) uses of deadly force by the Bridgeport Police Department since 2004.

104. Upon information and belief, neither Defendant City of Bridgeport nor Defendant Police Chief Gaudett have ever disciplined the three members of the Police Department, Defendants Amato, Borona and Borrico, who have been involved in four (4) of the seven (7) uses of deadly force by the Bridgeport Police Department since 2004 nor provided them with additional training on the proper use of deadly force nor added supervision despite the fact that these three officers appear to constitute outliers for their proclivity to use deadly force within the department.

105. Upon information and belief, neither Defendant City of Bridgeport nor Defendant Police Chief Gaudett have ever disciplined Defendant Amato and the two

other police officers who also used deadly force against Jonathan Mosely since September 2004, nor provided them with additional training or added supervision as to the use of less than deadly force, such as a Taser, after they fatally shot a man wielding a baseball bat when there was a total of six police officers responding together to confront Mr. Mosely.

106. Upon information and belief, neither Defendant City of Bridgeport nor Defendant Police Chief Gaudett have ever disciplined Defendants Amato or Borrico since May 3, 2006, nor provided them with additional training or added supervision in the risk to the public of engaging in high speed chases, and discharging their weapons at a moving vehicle in a public road.

107. Upon information and belief, and despite being on notice that Defendant Borona had intentionally, knowingly and maliciously lied in the Russo matter in violation of Mr. Russo's civil rights, neither Defendant City of Bridgeport nor Defendant Chief of Police Gaudett ever disciplined Defendant Borona for his lies in Russo, or provided additional training and supervision; nor investigated whether Defendant Borona lied in his Statement to Captain Viadero in the Stukes matter as his Statement varies in material ways from the video, or disciplined Defendant Borona for such lies or provided

him with additional training and supervision.

108. Within six months of the use of deadly force incident herein described, Plaintiff, through her attorney, sent the requisite Notice to the City Clerk of Defendant City of Bridgeport that informed Defendant City of Bridgeport that Plaintiff intended to commence litigation against members of the Bridgeport Police Department and the City of Bridgeport.

**FIRST COUNT**

**42 U.S.C. § 1983. FEDERAL CIVIL ACTION FOR DEPRIVATION OF RIGHTS: PEACE OFFICER LIABILITY**

1-108. Paragraphs 1 through 108 of the Preliminary Statement are hereby incorporated by reference as Paragraphs 1-108 of this Count as though fully set forth herein.

109. Plaintiff brings a claim against Defendants Amato, Walker, Borona, Borrico, Ronan and Martinez, individually as well as in their official capacity, pursuant to 42 U.S.C § 1983 and for punitive damages.

110. Defendants Amato, Walker, Borona, Borrico, Ronan and Martinez had a duty to perform the responsibilities of their position as police officers without the use of excessive force.

111. Because the integrity of police service is based on honesty and truthfulness, Defendants Amato, Walker, Borona, Borrico, Ronan and Martinez had a duty not knowingly or willfully to be dishonest or untruthful in rendering any report, in any official oral or written communication, or in giving any statement about actions taken that related to the officer's own or another officer's employment or position. Being dishonest or untruthful includes knowingly or willfully making false statements, knowingly or willfully falsifying work-related records or official documents, omitting material facts or material information, providing information in a manner that is deceptive, evasive or misleading, or making false statements to seek unlawfully to influence the outcome of any investigation.

112. Defendants Amato and Walker, by planning an undercover operation involving the purchase of firearms to transpire in a public setting that intentionally and willfully failed first to secure those firearms by completing the undercover purchase with the funds provided by the Gang Task Force before having members of the Bridgeport Police Department move in for the arrest, constituted police misconduct, demonstrating a willful and malicious disregard and deliberate indifference of the Plaintiff's Decedent, and that failing to secure the weapons in advance by completing the sale before the

police moved in for the arrest under cover of darkness made it highly likely that the police surrounding the vehicle would use deadly force as they would fear for their lives or the lives of the public believing that those inside the vehicle continued to have firearms at their disposal.

113. Defendants Borona, Borrico, Ronan and Martinez, by failing first to advise Defendants Amato and Walker during their briefing on the undercover operation that planning an undercover operation involving the purchase of firearms to transpire in a public setting, which intentionally and willfully failed first to secure those firearms by completing the undercover purchase with the funds provided by the Gang Task Force, before having members of the Bridgeport Police Department move in for the arrest constituted conscience-shocking police misconduct, demonstrated a willful and malicious and disregard and deliberate indifference for persons including including the Plaintiiff's Decedent, because failing to secure the weapons in advance by completing the sale before the police moved in for the arrest made it highly likely that the police surrounding the vehicle would use deadly force as they would fear for their lives or the lives of the public believing that those inside the vehicle continued to have firearms at their disposal.

114. Defendants Borona, Borrico, Ronan and Martinez, by failing to require and

make revisions to the undercover operation, such as completing the firearm sale before the police moved in; establishing a signal to call off the operation if circumstances changed making the operation more risky and dangerous to the public; and revising the plan for another day and location that did not put the public at such risk, constituted police misconduct that demonstrated deliberate indifference to persons including Plaintiff's Decedent

115. As each subsequent change in circumstances transpired as is set forth more fully above, Defendants Amato and Walker for failing to revise their undercover operation based on these new events, and Defendants Borona, Borrico, Ronan and Walker for failing to advise Defendants Amato and Walker to revise their undercover operation based on these new events, including but not limited to completing the gun purchase so that there would not be firearms in the Altima when the police surrounded it to execute the arrest, or calling off the undercover operation for another time and less public place, engaged in conscience-shocking police misconduct that ended the life of Plaintiff's Decedent prematurely.

116. Force is excessive, and therefore violates the Fourth Amendment, if it is not reasonable in light of the circumstances facing the officer. See, Gramham v. O'Connor,

490 U.S. 386, 398 (1989). Here, Defendants Amato, Walker, Borona, Borrico, Ronan and Martinez had it within their purview to change the "circumstances facing the officer" by completing the purchase of the firearms or calling off the undercover operation based on its changing fluidity for another time and less public place, such that no use of force should have been necessary or reasonable.

117. The facts and circumstances of this case demonstrate that Defendant Borona's final shot at a time when he knew that Plaintiff's Decedent was unarmed, injured from multiple gunshot wounds and lying face down on the ground was clearly unreasonable.

118. Defendant Borona did not have a reasonable fear of imminent bodily harm to himself or any other person when he fired his eighth shot through Plaintiff Decedent's back at a time when Defendant Borona knew that Plaintiff's Decedent was unarmed, injured from multiple gunshot wounds and lying on the ground. Consequently, Borona's eighth and final shot was unwarranted under these circumstances, and was objectively unreasonable when comparing or balancing the amount of force used against the need for force.

119. By using subjectively and objectively unreasonable deadly force while

acting under color of state law, under the totality of circumstances, Defendants Walker, Borona, Borrico and Ronan violated the civil rights secured to Plaintiff's Decedent by the Fourth and Fourteenth Amendments to the United States Constitution and caused his wrongful death.

120. By allowing the undercover operation to unfold, as poorly planned and as deliberately indifferent to the public and plaintiff's decedent such that other officers participating used subjectively and objectively unreasonable deadly force while acting under color of state law, Defendants Amato and Martinez, under the totality of circumstances, also violated the civil rights secured to Plaintiff's Decedent by the Fourth and Fourteenth Amendments to the United States Constitution and caused his wrongful death.

121. As a direct and proximate result of this aforementioned shooting inflicted upon the Plaintiff's Decedent, Carnell Williams, he suffered extreme and fatal injuries to his body, including the aforementioned gunshot wounds.

122. The injuries sustained by the Plaintiffs' Decedent, Carnell Williams, resulted in his death, after excruciating physical pain and mental anguish.

123. As a direct and proximate result of the aforementioned shootings, the

Estate of the Plaintiffs' Decedent, Carnell Williams, has been obliged to expend and lay out large sums of money for funeral and burial costs.

124. As a further result of the aforementioned shooting of the Plaintiffs' Decedent, Carnell Williams, will be unable to make contributions to his household, resulting in loss of income and earning capacity to his estate.

125. As a further direct and proximate result of the aforesaid shooting, the Plaintiffs' Decedent, Carnell Williams, has been denied his normal and expected life span and enjoyments, including pursuit of family and other loving relationships, friendships, anticipated recreational activities and expected landmarks and achievements in his life and fulfillment of his life's goals and passions, all to the loss and detriment of his estate.

## SECOND COUNT

## 42 U.S.C. § 1983 and § 1988. FEDERAL CIVIL ACTION FOR DEPRIVATION OF RIGHTS: MUNICIPAL LIABILITY

1-125. Paragraphs 1 through 125 of the First Count are hereby incorporated by reference as Paragraphs 1-125 of this Count as though fully set forth herein.

126. Defendant City of Bridgeport is also liable under 42 U.S.C.§§ 1983 and 1988 for failing to supervise and train its police officers, and for overlooking and covering

up officer misconduct.

127. In addition, Defendant City of Bridgeport has had a general policy, pattern and/or practice of not disciplining police officers for their conduct, thereby sanctioning the police officers' actions, which amounted to a departmental policy of overlooking constitutional violations and deliberate untruthfulness.

128. Defendant City of Bridgeport's failure to supervise and train its police officers, and the City's willful blindness towards the constitutional violations of its officers, constitutes gross negligence and/or deliberate and conscious indifference to people's rights including the right to be free from unreasonable search and seizure and the rights conveyed to the Plaintiff's Decedent under this state's Wrongful Death Statute as applied through 42 U.S.C. §§ 1983 and 1988.

129. Additionally, municipalities may be held liable under 42 U.S.C.§ 1983 for constitutional torts that are committed pursuant to a policy, procedure, practice of custom of the municipality. Even if Defendant City of Bridgeport's practice of overlooking constitutional torts was not authorized by an officially adopted policy, the practice was so common and well settled that it represents official policy. See, Board of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404 (1997).

130. The formal and informal actions of Defendant City of Bridgeport and Defendant Police Chief Gaudett in overlooking, hiding, and/or tacitly encouraging police misconduct by its officers, including Defendants Amato, Borona, Borrico, Ronan, Walker and Martinez, reflect a policy, practice, custom and procedure authorizing and allowing the excessive use of force and deliberate deception both of which violate the civil rights of Plaintiff's Decedent.

131. Defendant City of Bridgeport and Defendant Police Chief Gaudett are liable for the constitutional torts of Defendants Amato, Walker, Borona, Borrico, Ronan and Martinez because they sanctioned the following customs, practices and policies:

(A) Using excessive force when it is not necessary or permitted by law;

(B) Using deadly force when such force is not necessary or permitted by law;

( C) Ignoring the serious need for ongoing training and supervising its officers in regard to the use of force, particularly once those officers have used deadly force already;

(D) Failing to discipline those persons whom are found to have engaged in the use of excessive force upon those entrusted to their care or under their control;

(E) Failing adequately to supervise and observe its officers;

(F) Failing adequately to train officers regarding the availability of alternative means of detaining persons other than the use of deadly force;

(G) Failing to discharge officers who have shown a pattern or practice of using excessive force;

(H) Failing adequately to train and supervise officers as to the proper procedures to use in undercover operations;

(I) Failing to discharge officers who have shown a pattern or practice of untruthfulness, where such untruthfulness violates the civil rights of others or is intended to cover up that officer's improper or illegal actions or unlawfully influence the outcome of an investigation;

(J) Adopting a practice whereby officers who are unfit for peace officer duties, as shown by prior actions in the line of duty, are allowed to retain their positions;

(K) Failing to ensure that police incident reports contain all material information and that police officers do not intentionally fail to disclose facts that place that officer in a bad light, when any reasonable person would consider such

omissions as conscious-shocking misconduct.

(L) Allowing police officers involved in the use of deadly force to conspire with each other before presenting each individual account of the incident by way of letters to Captain Viadero weeks after the demise of Carnell Williams, and failing thereafter to question officers as to any discrepancies or all too convenient consistencies at odds with other reports or evidence.

(M) Having been on notice since May of 2008 that Defendant Borona had deliberately lied and concealed exculpatory information in violation of Christopher Russo’s constitutional rights, and thereafter having been on notice as to the discrepancies between Borona’s letter to Chief Viadero describing his use of deadly force against Bryan Stukes and the videotape footage of the event, as well as the later recovery of another bullet in addition to the two casings earlier recovered that forensic science confirmed had been fired from Borona’s service weapon, necessitating that Borona had placed a hollow point bullet into the chamber of his service weapon prior to surrendering that weapon intentionally to conceal that he

had fired three shots at Stukes not the two that Borona claimed, allowing Defendant Borona to again report his involvement in the use of deadly force against Carnell Williams weeks after the event by way of a letter to Captain Viadero without any further and detailed inquiry.

132. At the time Defendants Borona, Borrico, Ronan and Walker shot and killed Plaintiff's Decedent, Carnell Williams, just days after his twenty-third birthday, and Defendants Amato and Martinez were part of an undercover gun buy that intentionally failed to secure firearms for sale before the police moved in for the arrest, they were acting pursuant to an official city policy, practice, custom and procedure overlooking and/or authorizing police officer's excessive use of force.

133. Defendant City of Bridgeport's policy, custom and practice of overlooking and covering up police brutality and untruthfulness, particularly where black lives are involved, as administered by Defendant Chief Gaudett, was a direct cause of the death of Carnell Williams, Plaintiff's Decedent. In particular, the City's policy, custom and practice caused Carnell Williams to be deprived of his constitutional rights to be free from unlawful seizures and objectively unreasonable force under the Fourth and Fourteenth Amendments and his rights taken from the Connecticut wrongful death statute as applied

through 42 U.S.C. § 1983 and 1988.

134. A city may be liable for its failure to train a single police officer when the officer's acts were so egregious that the city should have had clear warning that the particular officer posed a danger to citizens; such liability applies because the need for additional or different training was obvious as to Defendants Amato, Borona and Borrico for being outliers in the use of deadly force in Bridgeport since 2004 as Defendant Amato was involved in three of seven uses of deadly force and Defendants Borona and Borrico were each involved in two of seven uses of deadly force and Defendant Borona had materially lied, costing the city the sum of $250,000 in damages.

135. Defendant City of Bridgeport's acts and omissions, when viewed objectively, involved an extreme degree of risk, considering the probability and magnitude of harm to others. The City had actual, subjective awareness of the risks involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others, including Plaintiff's Decedent.

136. In view of the known risk posed by Defendant Borona to engage in deliberate deception in violation of a person's constitutional rights, which misconduct shocks the conscience, and the risks posed by Defendants Amato, Borona and Borrico

as to the prior use of deadly force, Defendant City of Bridgeport and Defendant Chief Gaudett's failure to provide additional training and supervision to these Defendants constitutes gross negligence and/or deliberate and conscious indifference to the rights, safety and welfare of others, including Plaintiff's Decedent.

137. After the deaths of Bryan Stukes in April of 2013 and Carnell Williams in November of 2013 from the use of deadly force, both of which involved Defendant Borona within a seven month period, and the latter of which represented the second use of deadly force by Defendant Borrico and the third involvement of Defendant Amato in a use of deadly force since 2004, Defendant City of Bridgeport and Defendant Chief Gaudett sent a police lieutenant and two city attorneys in December 2013 to a three day conference focused on the latest and best practices in use of force policies. Information from that conference purportedly led the department to review policies to help improve record keeping.

138. Although an outcome from that conference was that the City and Defendant Gaudett claimed that the command staff was constantly reviewing polices for the betterment of the department, including conducting periodic reviews of all use-of-force reports and investigations to ensure that they are thorough and complete, upon

information and belief the City and Defendant Gaudett knowingly, intentionally, recklessly and maliciously failed to conduct a review of the use of deadly force by Defendant Borona in the Stukes matter against the video footage or in the use of deadly force against Plaintiff's decedent.

139. Defendant City of Bridgeport and Defendant Gaudett knowingly, intentionally, recklessly and maliciously failed to conduct such a review of the use of deadly force reports in Stukes and Carnell because such review would have revealed that the City and Defendant Gaudett should have known their inadequate supervision was so likely to result in the alleged deprivations so as to constitute deliberate indifference; (2) there were obvious and severe deficiencies in their supervision that reflect a purposeful rather than negligent course of action; and (3) there was a causal relationship between the failure to supervise and the deprivations to Plaintiff's Decedent.

140. Defendant City of Bridgeport and Defendant Gaudett knowingly, intentionally, recklessly and maliciously failed to conduct such a review of the use of deadly force reports in Stukes and Carnell because they knew that such review would reveal that Department officers were in some way predisposed to unconstitutional action and such predisposition was known, or should have been known, to the supervisory

personnel who did not act to counter it.

141. Defendant City of Bridgeport and Defendant Gaudett knowingly, intentionally, recklessly and maliciously failed to conduct such a review of the use of deadly force reports in Stukes and Carnell because they knew that such review would reveal that line officers knew that they could engage in an abuse of rights involving minorities without rising appropriate disciplinary consequences.

## THIRD COUNT

## WRONGFUL DEATH PURSUANT TO GEN. STAT. § 52-555: RECKLESSNESS

1-23. Paragraphs 1-23 of the First Count are incorporated by reference as though fully stated herein and hereby become Paragraphs 1- 23 of this count.

24. Despite this added information that “Kiki” might be accompanied by a “crazy” African American male and that one of the guns might have been used in a Norwalk shooting, both of which necessarily raised the danger quotient, Defendants Amato and Walker made no revisions to their planned undercover operation, such as securing the guns by having Defendant Walker actually complete the sale before the police moved in for an arrest, or establishing a signal to call off the undercover operation

if conditions changed, and instead continued their plan that the undercover operation was to take place with firearms left on the persons to be arrested in a public setting, thus recklessly putting the public, including Plaintiff's Decedent, at risk.

25. Despite this added information that "Kiki" might be accompanied by a "crazy" African American male and that one of the guns might have been used in a Norwalk shooting, both of which necessarily raised the danger quotient, Defendants Borona, Borrico, Ronan and Martinez failed to request revisions from Defendants Amato and Walker to their planned undercover operation, such as securing the guns by having Defendant Walker actually complete the sale before the police moved in for an arrest or establishing a signal to call off the operation if conditions changed. By acquiescing in the plan that the undercover operation was to take place in a public setting, without any revisions, Defendants Borona, Borrico, Ronan and Martinez thus recklessly put the public, including Plaintiff's Decedent, at risk.

26-28. Paragraphs 26 through 28 of the First Count are incorporated by reference as though fully stated herein and hereby becomes Paragraphs 26-28 of this count.

29. Because the unmarked police vehicles took up positions at the Burger King/shopping center parking lot at approximately 6:20 p.m., the briefing by Defendants

Amato and Walker could have been no more than fifteen minutes in duration, and likely much less. The immediacy of the briefing in relation to the planned undercover operation, its limited duration, and the abject failure to establish a signal to abort the planned cover operation should something unanticipated occur contributed to endangering the public, thus recklessly putting the public, including Plaintiff's Decedent, at risk.

30-32. Paragraphs 30 through 32 of the First Count are incorporated by reference as though fully stated herein and hereby becomes Paragraphs 30-32 of this count.

33. Despite the deliberate disinformation as to her location inside Burger King, and the "extended" period when Ms. Davis failed to respond to Defendant Walker's multiple attempts at contact, Defendants Amato and Walker made no adjustments to the planned undercover operation, such as securing the guns by completing the buy before moving in for the arrest, or cancelling the operation entirely because the changing circumstances enhanced the potential for danger in this public setting, thereby recklessly putting the public, including Plaintiff's Decedent, at risk.

34. Despite the deliberate disinformation as to her location inside Burger King, and the "extended" period when Ms. Davis failed to respond to Defendant Walker's

multiple attempts at contact, Defendants Borona, Borrico, Ronan and Martinez failed to advise Defendants Amato and Walker to make adjustments to the planned undercover operation, such as securing the guns by completing the buy before moving in for the arrest, or cancelling the operation entirely because the changing circumstances enhanced the potential for danger in this public setting, thereby recklessly putting the public, including Plaintiff's Decedent, at risk.

35-38. Paragraphs 35 through 38 of the First Count are incorporated by reference as though fully stated herein and hereby becomes Paragraphs 35-38 of this count.

39. Despite Defendant Walker's increased concerns about the dangers this undercover operation in a public setting now presented, Defendants Amato and Walker failed to make any adjustments to their planned undercover operation, including calling it off as too risky under existing circumstances and/or securing the firearms by completing the buy before moving in for the arrest, thereby recklessly putting the public, including Plaintiff's Decedent, at risk.

40. Despite Defendant Walker's increased concerns about the dangers this undercover operation in a public setting now presented, Defendants Borona, Borrico, Ronan and Martinez failed to advise Defendants Amato and Walker to make any

adjustments to their planned undercover operation, including calling it off as too risky under existing circumstances and/or securing the firearms by completing the buy before moving in for the arrest, thereby recklessly putting the public, including Plaintiff's Decedent, at risk.

41. Although Defendant Amato had issued instructions that his vehicle was to be the take down lead, he instead kept his vehicle in its original location watching two Hispanic males in a black Honda who might have been acting as look-outs for "Kiki" and ordered the other vehicles to move in positions to watch Defendant Walker at his new location; despite the fact that his vehicle was not positioned to watch Defendant Walker at his new location, Defendant Amato never issued an order that another vehicle should assume the take down lead.

42. Despite the fact that Ms. Davis had not arrived in a black Honda as she had proffered; that she had lied about being inside the Burger King; that the police had added concerns that two Hispanic males in a black Honda were acting as her look-out, thereby raising the number of potential individuals subject to arrest; that Defendant Amato was no longer in a position to act as the take down lead as was previously planned and without a back-up plan for a secondary take down lead; and that this was a

public setting at the dinner hour, Defendants Amato and Walker failed to make any adjustments to their planned undercover operation, including calling it off as too risky under existing circumstances and/or securing the firearms by completing the buy before moving in for the arrest, thereby recklessly putting the public, including Plaintiff's Decedent, at risk.

43. Despite the fact that Ms. Davis had not arrived in a black Honda as she had proffered; that she had lied about being inside the Burger King; that the police had added concerns that two Hispanic males in a black Honda were acting as her look-out, thereby raising the number of potential individuals subject to arrest; that Defendant Amato was no longer in a position to act as the take down lead as was previously planned and without a back-up plan for a secondary take down lead; and that this was a public setting at the dinner hour, Defendants Borona, Borrico, Ronan and Martinez failed to advise Defendants Amato and Walker to make any adjustments to their planned undercover operation, including calling it off as too risky under existing circumstances and/or securing the firearms by completing the buy before moving in for the arrest, thereby recklessly putting the public, including Plaintiff's Decedent, at risk.

44. Defendant Walker then observed a gold colored Nissan Altima with its lights

on and engine running in the parking space in front of his new location; that car drove away but pulled into the same spot moments later, parking next to a civilian van. Defendant Walker notified his police team that he believed this was the suspect vehicle and not the black Honda. Ms. Davis contacted Defendant Walker at this juncture asking him to turn off his head lights. Defendant Walker complied but informed Ms. Davis that he would be leaving "because [he] was not comfortable and she appeared to be playing [him] for a fool." (Defendant Walker's Statement to Captain Viadero, Bridgeport Detective Bureau, dated December 13, 2013, Second full Paragraph, p. 2).

45. Despite the fact that Ms. Davis had parked next to a civilian van; that Defendant Walker was uncomfortable with Ms. Davis having asserted control over the undercover operation and told her that he would be leaving, which would have allowed sufficient time for this undercover operation to regroup on another occasion under safer circumstances, including adding a no-go signal and modifying the plan to purchase the firearms prior to moving in for the arrest, Defendants Amato and Walker failed to make any adjustments to their planned undercover operation, including calling it off as too risky under existing circumstances and/or securing the firearms by completing the buy before moving in for the arrest, thereby recklessly putting the public, including Plaintiff's

Decedent, at risk.

46. Despite the fact that Ms. Davis had parked next to a civilian van; that Defendant Walker was uncomfortable with Ms. Davis having asserted control over the undercover operation and told her that he would be leaving, which would have allowed sufficient time for this undercover operation to regroup on another occasion under safer circumstances, including adding a no-go signal and modifying the plan to purchase the firearms before moving in for the arrest, Defendants Borona, Borrico, Ronan and Martinez failed to advise Defendants Amato and Walker to make any adjustments to their planned undercover operation, including calling it off as too risky under existing circumstances and/or securing the firearms by completing the buy before moving in for the arrest, thereby recklessly putting the public, including Plaintiff's Decedent, at risk.

47. Like Defendant Walker, Defendant Borona also expressed "added concern" that the female seller was stalling the buy and concealing her identify by not providing an accurate description of the vehicle she was driving and misrepresented her location by claiming she was in Burger King purchasing food. (Defendant Borona's Statement to Captain Viadero, Bridgeport Detective Bureau, dated December 19, 2013, Third Paragraph, p. 1, which statement was provided *24 days after* the undercover sting

operation ended in the death of Carnell Williams, Plaintiff's Decedent).

48. Despite these added concerns, particularly given the public setting of this undercover operation, Defendant Borona failed to advise Defendants Amato and Walker that they should revise their plan accordingly and either postpone the operation to another time or secure the weapons from the female seller by completing the buy before police moved in for an arrest, thereby recklessly putting the public, including Plaintiff's Decedent, at risk.

49--53. Paragraphs 49 through 53 of the First Count are incorporated by reference as though fully stated herein and hereby becomes Paragraphs 49-53 of this count.

54. If indeed Defendant Walker believed that the gun displayed to him was loaded and that "Kiki" had brought "crazy" "Nay,Nay" who might cause problems for protection, particularly given the fact that the Burger King/strip mall parking lot was a public setting necessarily placing families and individuals, including Plaintiff's decedent at risk, then Defendant Walker should have delayed providing the agreed upon take down signal and instead should have first communicated this information to Defendant Amato over channel #6 so that Defendants Amato and Walker could change their plan of

operation, informing the other police present, to have Defendant Walker actually purchase the guns with the $750 he had in his possession so that there would be no loaded weapons, or any weapons of any kind, in Ms. Davis' vehicle when the police team moved in for the arrest. By failing to amend their undercover operation given this additional information, Defendants Amato and Walker recklessly put the public, including Plaintiff's Decedent, at risk.

55. Because Defendant Walker was talking at the Altima's passenger window, based on the briefing, Defendants Amato, Borona, Borrico, Ronan and Martinez were operating with the knowledge that "Kiki" had brought "Nay,Nay" who might cause unexpected problems because he was "crazy," particularly given the fact that the Burger King/strip mall parking lot was a public setting necessarily placing families and individuals, including Plaintiff's decedent at risk.

56. Based on confirmation that "Nay, Nay" was indeed present, Defendants Amato, Borona, Borrico, Ronan and Martinez should have consulted with each other and Defendant Walker once he was at his own vehicle, advising a change in plan, to have Defendant Walker return to the Altima and actually purchase the guns with the $750 he had in his possession so that there would be no loaded weapons, or any weapons of any

kind, in Ms. Davis' vehicle when the police team moved in for the arrest. By failing to amend the undercover operation given this additional information, Defendants Amato, Borona, Borrico, Ronan and Martinez recklessly put the public, including Plaintiff's Decedent, at risk.

57-108. Paragraphs 57 through 108 of the First Count are incorporated by reference as though fully stated herein and hereby becomes Paragraphs 57-108 of this count.

109. Cause of action is legally defined by finding the identity of tortfeasors and the causal nexus. Although Plaintiff knew the name of the tortfeasors shortly after Carnell William's death on November 25, 2013, she did not ascertain the causal nexus until the release of the State's Attorney for the Judicial District of Litchfield's investigation on May 19, 2015, thus bringing this cause of action within the two year statute of limitations for wrongful death.

110. Defendants Amato, Walker, Borona, Borrico, Ronan and Martinez had a duty to perform the responsibilities of their position as police officers without the use of excessive force.

111. Because the integrity of police service is based on honesty and

truthfulness, Defendants Amato, Walker, Borona, Borrico, Ronan and Martinez had a duty not knowingly or willfully to be dishonest or untruthful in rendering any report, in any official oral or written communication, or in giving any statement about actions taken that related to the officer's own or another officer's employment or position. Being dishonest or untruthful includes knowingly or willfully making false statements, knowingly or willfully falsifying work-related records or official documents, omitting material facts or material information, providing information in a manner that is deceptive, evasive or misleading, or making false statements to seek unlawfully to influence the outcome of any investigation.

112. Defendants Amato and Walker, by planning an undercover operation involving the purchase of firearms to transpire in a public setting that recklessly failed first to secure those firearms by completing the undercover purchase with the funds provided by the Gang Task Force before having members of the Bridgeport Police Department move in for the arrest, constituted reckless police misconduct, demonstrating a reckless disregard and indifference for minorities, including Plaintiff's Decedent, and that failing to secure the weapons in advance by completing the sale before the police moved in for the arrest under cover of darkness made it highly likely

that the police surrounding the vehicle would use deadly force as they would fear for their lives or the lives of the public believing that those inside the vehicle continued to have firearms at their disposal.

113. Defendants Borona, Borrico, Ronan and Martinez, by failing first to advise Defendants Amato and Walker during their briefing on the undercover operation that planning an undercover operation involving the purchase of firearms to transpire in a public setting, which recklessly failed first to secure those firearms by completing the undercover purchase with the funds provided by the Gang Task Force, before having members of the Bridgeport Police Department move in for the arrest, engaged in reckless police misconduct and demonstrated a reckless disregard and indifference for minorities including Plaintiff's Decedent, because failing to secure the weapons in advance by completing the sale before the police moved in for the arrest made it highly likely that the police surrounding the vehicle would use deadly force as they would fear for their lives or the lives of the public believing that those inside the vehicle continued to have firearms at their disposal.

114. The acts and omissions of Defendants Borona, Borrico, Ronan and Martinez, by failing to require Defendants Amato and Walker to make revisions to the

undercover operation, such as completing the firearm sale before the police moved in; establishing a signal to call off the operation if circumstances changed making the operation more risky and dangerous to the public; and revising the plan for another day and location that did not put the public at such risk, constituted reckless police misconduct that demonstrated reckless indifference to minorities including Plaintiff's Decedent.

115. As each subsequent change in circumstances transpired as is set forth more fully above, Defendants Amato and Walker for failing to revise their undercover operation based on these new events, and Defendants Borona, Borrico, Ronan and Walker for failing to advise Defendants Amato and Walker to revise their undercover operation based on these new events, including but not limited to completing the gun purchase so that there would not be firearms in the Altima when the police surrounded it to execute the arrest, or calling off the undercover operation for another time and less public place, engaged in reckless police misconduct that ended the life of Plaintiff's Decedent prematurely.

116. Here, Defendants Amato, Walker, Borona, Borrico, Ronan and Martinez had it within their purview to change the "circumstances facing the officer" by completing

the purchase of the firearms or calling off the undercover operation based on its changing fluidity for another time and less public place, such that no use of force should have been necessary or reasonable.

117. The facts and circumstances of this case demonstrate that Defendant Borona's final shot at a time when he knew that Plaintiff's Decedent was unarmed, injured from multiple gunshot wounds and lying face down on the ground was reckless and clearly unreasonable.

118. Defendant Borona did not have a reasonable fear of imminent bodily harm to himself or any other person when he fired his eighth shot through Plaintiff Decedent's back at a time when Defendant Borona knew that Plaintiff's Decedent was unarmed, injured from multiple gunshot wounds and lying on the ground. Consequently, Borona's eighth third and final shot was unwarranted under these circumstances, and was objectively reckless when comparing or balancing the amount of force used against the need for force.

119. By allowing the undercover operation to unfold as poorly planned and as deliberately indifferent to minorities such that other officers participating used subjectively and objectively unreasonable deadly force while acting under color of state law,

Defendants Amato, Walker, Borona, Borrico, Ronan and Martinez, under the totality of circumstances, recklessly caused the death of Plaintiff's Decedent.

120. As a direct and proximate result of these aforementioned reckless actions on the part of the Defendants Amato, Walker, Borona, Borrico, Ronan and Martinez, the Plaintiffs' Decedent, Carnell Williams, was shot and killed by Defendants Borona, Borrico, Walker and Ronan.

121. The aforementioned reckless actions on the part of the Defendants Amato, Walker, Borona, Borrico, Ronan and Martinez, which enhanced the risk deadly force would be used is contrary to good police procedure, created a danger to themselves and the public, including Ms. Davis and Plaintiff's Decedent, and by that reckless conduct caused foreseeable harm to Plaintiff's Decedent.

122-126. Paragraphs 121 through 125 of the First Count are incorporated by reference as though fully stated herein and hereby becomes Paragraphs 122-126 of this count.

127. As a direct and proximate result of Defendants' reckless conduct, Plaintiff's Decedent suffered damages, as set forth herein.

**FOURTH COUNT**

**WRONGFUL DEATH PURSUANT TO GEN. STAT. § 52-555: NEGLIGENCE**

1-23. Paragraphs 1-23 of the First Count are incorporated by reference as though fully stated herein and hereby become Paragraphs 1- 23 of this count.

24. Despite this added information that “Kiki” might be accompanied by a “crazy” African American male and that one of the guns might have been used in a Norwalk shooting, both of which necessarily raised the danger quotient, Defendants Amato and Walker made no revisions to their planned undercover operation, such as securing the guns by having Defendant Walker actually complete the sale before the police moved in for an arrest, or est.ablishing a signal to call off the undercover operation if conditions changed, and instead continued their plan that the undercover operation was to take place with firearms left on the persons to be arrested in a public setting, thus negligently putting the public, including Plaintiff’s Decedent, at risk.

25. Despite this added information that “Kiki” might be accompanied by a “crazy” African American male and that one of the guns might have been used in a Norwalk shooting, both of which necessarily raised the danger quotient, Defendants Borona, Borrico, Ronan and Martinez failed to request revisions from Defendants Amato

and Walker to their planned undercover operation, such as securing the guns by having Defendant Walker actually complete the sale before the police moved in for an arrest or establishing a signal to call off the operation if conditions changed. By acquiescing in the plan that the undercover operation was to take place in a public setting, without any revisions, Defendants Borona, Borrico, Ronan and Martinez thus negligently put the public, including Plaintiff's Decedent, at risk.

26-28. Paragraphs 26 through 28 of the First Count are incorporated by reference as though fully stated herein and hereby becomes Paragraphs 26-28 of this count.

29. Because the unmarked police vehicles took up positions at the Burger King/ shopping center parking lot at approximately 6:20 p.m., the briefing by Defendants Amato and Walker could have been no more than fifteen minutes in duration, and likely much less. The immediacy of the briefing in relation to the planned undercover operation, its limited duration, and the abject failure to establish a signal to abort the planned cover operation should something unanticipated occur contributed to endangering the public, thus negligently putting the public, including Plaintiff's Decedent, at risk.

30-32. Paragraphs 30 through 32 of the First Count are incorporated by reference as though fully stated herein and hereby becomes Paragraphs 30-32 of this count.

33. Despite the deliberate misinformation as to her location inside Burger King, and the "extended" period when Ms. Davis failed to respond to Defendant Walker's multiple attempts at contact, Defendants Amato and Walker made no adjustments to the planned undercover operation, such as securing the guns by completing the buy before moving in for the arrest, or cancelling the operation entirely because the changing circumstances enhanced the potential for danger in this public setting, thereby negligently putting the public, including Plaintiff's Decedent, at risk.

34. Despite the deliberate misinformation as to her location inside Burger King, and the "extended" period when Ms. Davis failed to respond to Defendant Walker's multiple attempts at contact, Defendants Borona, Borrico, Ronan and Martinez failed to advise Defendants Amato and Walker to make adjustments to the planned undercover operation, such as securing the guns by completing the buy before moving in for the arrest, or cancelling the operation entirely because the changing circumstances enhanced the potential for danger in this public setting, thereby negligently putting the

public, including Plaintiff's Decedent, at risk.

35-38. Paragraphs 35 through 38 of the First Count are incorporated by reference as though fully stated herein and hereby becomes Paragraphs 35-38 of this count.

39. Despite Defendant Walker's increased concerns about the dangers this undercover operation in a public setting now presented, Defendants Amato and Walker failed to make any adjustments to their planned undercover operation, including calling it off as too risky under existing circumstances and/or securing the firearms by completing the buy before moving in for the arrest, thereby negligently putting the public, including Plaintiff's Decedent, at risk.

40. Despite Defendant Walker's increased concerns about the dangers this undercover operation in a public setting now presented, Defendants Borona, Borrico, Ronan and Martinez failed to advise Defendants Amato and Walker to make any adjustments to their planned undercover operation, including calling it off as too risky under existing circumstances and/or securing the firearms by completing the buy before moving in for the arrest, thereby negligently putting the public, including Plaintiff's Decedent, at risk.

41. Although Defendant Amato had issued instructions that his vehicle was to be the take down lead, he instead kept his vehicle in its original location watching two Hispanic males in a black Honda who might have been acting as look-outs for "Kiki" and ordered the other vehicles to move in positions to watch Defendant Walker at his new location; despite the fact that his vehicle was not positioned to watch Defendant Walker at his new location, Defendant Amato never issued an order that another vehicle should assume the take down lead.

42. Despite the fact that Ms. Davis had not arrived in a black Honda as she had proffered; that she had lied about being inside the Burger King; that the police had added concerns that two Hispanic males in a black Honda were acting as her look-out, thereby raising the number of potential individuals subject to arrest; that Defendant Amato was no longer in a position to act as the take down lead as was previously planned and without a back-up plan for a secondary take down lead; and that this was a public setting at the dinner hour, Defendants Amato and Walker failed to make any adjustments to their planned undercover operation, including calling it off as too risky under existing circumstances and/or securing the firearms by completing the buy before moving in for the arrest, thereby negligently putting themselves and the public, including

Plaintiff's Decedent, at risk.

43. Despite the fact that Ms. Davis had not arrived in a black Honda as she had proffered; that she had lied about being inside the Burger King; that the police had added concerns that two Hispanic males in a black Honda were acting as her look-out, thereby raising the number of potential individuals subject to arrest; that Defendant Amato was no longer in a position to act as the take down lead as was previously planned and without a back-up plan for a secondary take down lead; and that this was a public setting at the dinner hour, Defendants Borona, Borrico, Ronan and Martinez failed to advise Defendants Amato and Walker to make any adjustments to their planned undercover operation, including calling it off as too risky under existing circumstances and/or securing the firearms by completing the buy before moving in for the arrest, thereby negligently putting themselves and the public, including Plaintiff's Decedent, at risk.

44. Defendant Walker then observed a gold colored Nissan Altima with its lights on and engine running in the parking space in front of his new location; that car drove away but pulled into the same spot moments later, parking next to a civilian van. Defendant Walker notified his police team that he believed this was the suspect vehicle

and not the black Honda. Ms. Davis contacted Defendant Walker at this juncture asking him to turn off his head lights. Defendant Walker complied but informed Ms. Davis that he would be leaving “because [he] was not comfortable and she appeared to be playing [him] for a fool.” (Defendant Walker’s Statement to Captain Viadero, Bridgeport Detective Bureau, dated December 13, 2013, Second full Paragraph, p. 2).

45. Despite the fact that Ms. Davis had parked next to a civilian van; that Defendant Walker was uncomfortable with Ms. Davis having asserted control over the undercover operation and told her that he would be leaving, which would have allowed sufficient time for this undercover operation to regroup on another occasion under safer circumstances, including adding a no-go signal and modifying the plan to purchase the firearms prior to moving in for the arrest, Defendants Amato and Walker failed to make any adjustments to their planned undercover operation, including calling it off as too risky under existing circumstances and/or securing the firearms by completing the buy before moving in for the arrest, thereby negligently putting themselves and the public, including Plaintiff’s Decedent, at risk.

46. Despite the fact that Ms. Davis had parked next to a civilian van; that Defendant Walker was uncomfortable with Ms. Davis having asserted control over the

undercover operation and told her that he would be leaving, which would have allowed sufficient time for this undercover operation to regroup on another occasion under safer circumstances, including adding a no-go signal and modifying the plan to purchase the firearms before moving in for the arrest, Defendants Borona, Borrico, Ronan and Martinez failed to advise Defendants Amato and Walker to make any adjustments to their planned undercover operation, including calling it off as too risky under existing circumstances and/or securing the firearms by completing the buy before moving in for the arrest, thereby negligently putting themselves and the public, including Plaintiff's Decedent, at risk.

47. Like Defendant Walker, Defendant Borona also expressed "added concern" that the female seller was stalling the buy and concealing her identify by not providing an accurate description of the vehicle she was driving and misrepresented her location by claiming she was in Burger King purchasing food. (Defendant Borona's Statement to Captain Viadero, Bridgeport Detective Bureau, dated December 19, 2013, Third Paragraph, p. 1, which statement was provided *24 days after* the undercover sting operation ended in the death of Carnell Williams, Plaintiff's Decedent).

48. Despite these added concerns, particularly given the public setting of this

undercover operation, Defendant Borona failed to advise Defendants Amato and Walker that they should revise their plan accordingly and either postpone the operation to another time or secure the weapons from the female seller by completing the buy before police moved in for an arrest, and thereby negligently putting himself, his fellow officers and the public, including Plaintiff's Decedent, at risk.

49--53. Paragraphs 49 through 53 of the First Count are incorporated by reference as though fully stated herein and hereby becomes Paragraphs 49-53 of this count.

54. If indeed Defendant Walker believed that the gun displayed to him was loaded and that "Kiki" had brought "crazy" "Nay,Nay" who might cause problems for protection, particularly given the fact that the Burger King/strip mall parking lot was a public setting necessarily placing families and individuals, including Plaintiff's decedent at risk, then Defendant Walker should have delayed providing the agreed upon take down signal and instead should have first communicated this information to Defendant Amato over channel #6 so that Defendants Amato and Walker could change their plan of operation, informing the other police present, to have Defendant Walker actually purchase the guns with the $750 he had in his possession so that there would be no loaded weapons, or any weapons of any kind, in Ms. Davis' vehicle when the police team

moved in for the arrest. By failing to amend their undercover operation given this additional information, Defendants Amato and Walker negligently put themselves, their fellow officers and the public, including Plaintiff's Decedent, at risk.

55. Because Defendant Walker was talking at the Altima's passenger window, based on the briefing, Defendants Amato, Borona, Borrico, Ronan and Martinez were operating with the knowledge that "Kiki" had brought "Nay,Nay" who might cause unexpected problems because he was "crazy," particularly given the fact that the Burger King/strip mall parking lot was a public setting necessarily placing families and individuals, including Plaintiff's decedent at risk.

56. Based on confirmation that "Nay, Nay" was indeed present, Defendants Amato, Borona, Borrico, Ronan and Martinez should have consulted with each other and Defendant Walker once he was at his own vehicle, advising a change in plan, to have Defendant Walker return to the Altima and actually purchase the guns with the $750 he had in his possession so that there would be no loaded weapons, or any weapons of any kind, in Ms. Davis' vehicle when the police team moved in for the arrest. By failing to amend the undercover operation given this additional information, Defendants Amato, Borona, Borrico, Ronan and Martinez negligently put themselves, their fellow officers and

the public, including Plaintiff's Decedent, at risk.

57-108. Paragraphs 57 through 108 of the First Count are incorporated by reference as though fully stated herein and hereby becomes Paragraphs 57-108 of this count.

109. Cause of action is legally defined by finding the identity of tortfeasors and the causal nexus. Although Plaintiff knew the name of the tortfeasors shortly after Carnell William's death on November 25, 2013, she did not ascertain the causal nexus until the release of the State's Attorney for the Judicial District of Litchfield's investigation on May 19, 2015, thus bringing this cause of action within the two year statute of limitations for wrongful death.

110. Defendants Amato, Walker, Borona, Borrico, Ronan and Martinez had a duty to perform the responsibilities of their position as police officers without the use of excessive force.

111. Defendants Amato and Walker, by planning an undercover operation involving the purchase of firearms to transpire in a public setting that negligently failed first to secure those firearms by completing the undercover purchase with the funds provided by the Gang Task Force before having members of the Bridgeport Police

Department move in for the arrest, engaged in negligent police misconduct, demonstrating a negligent disregard and indifference for minorities including Plaintiff's Decedent, and that failing to secure the weapons in advance by completing the sale before the police moved in for the arrest under cover of darkness made it highly likely that the police surrounding the vehicle would use deadly force as they would fear for their lives or the lives of the public believing that those inside the vehicle continued to have firearms at their disposal.

112. Defendants Borona, Borrico, Ronan and Martinez, by failing first to advise Defendants Amato and Walker during their briefing on the undercover operation that planning an undercover operation involving the purchase of firearms to transpire in a public setting, which negligently failed first to secure those firearms by completing the undercover purchase with the funds provided by the Gang Task Force, before having members of the Bridgeport Police Department move in for the arrest constituted negligent police misconduct, demonstrated a negligent disregard and indifference for minorities including Plaintiff's Decedent, because failing to secure the weapons in advance by completing the sale before the police moved in for the arrest made it highly likely that the police surrounding the vehicle would use deadly force as they would fear

for their lives or the lives of the public believing that those inside the vehicle continued to have firearms at their disposal.

113. Defendants Borona, Borrico, Ronan and Martinez, by failing to require and make revisions to the undercover operation, such as completing the firearm sale before the police moved in; establishing a signal to call off the operation if circumstances changed making the operation more risky and dangerous to the public; and revising the plan for another day and location that did not put the public at such risk, engaged in negligent police misconduct that demonstrated negligent indifference to minorities including Plaintiff's Decedent.

114. As each subsequent change in circumstances transpired as is set forth more fully above, Defendants Amato and Walker for failing to revise their undercover operation based on these new events, and Defendants Borona, Borrico, Ronan and Walker for failing to advise Defendants Amato and Walker to revise their undercover operation based on these new events, including but not limited to completing the gun purchase so that there would not be firearms in the Altima when the police surrounded it to execute the arrest, or calling off the undercover operation for another time and less public place, engaged in negligent police misconduct that ended the life of Plaintiff's Decedent

prematurely.

115. Here, Defendants Amato, Walker, Borona, Borrico, Ronan and Martinez had it within their purview to change the “circumstances facing the officer” by completing the purchase of the firearms or calling off the undercover operation based on its changing fluidity for another time and less public place, such that no use of force should have been necessary or reasonable.

116. The facts and circumstances of this case demonstrate that Defendant Borona’s final shot at a time when he knew that Plaintiff’s Decedent was unarmed, injured from multiple gunshot wounds and lying face down on the ground was negligent.

117. Defendant Borona did not have a reasonable fear of imminent bodily harm to himself or any other person when he fired his eighth shot through Plaintiff Decedent’s back at a time when Defendant Borona knew that Plaintiff’s Decedent was unarmed, injured from multiple gunshot wounds and lying on the ground. Consequently, Borona’s eighth third and final shot was unwarranted under these circumstances, and was objectively negligent when comparing or balancing the amount of force used against the need for force.

118. By allowing the undercover operation to unfold, as poorly planned and as

deliberately indifferent to minorities such that other officers participating used subjectively and objectively unreasonable deadly force while acting under color of state law, Defendants Amato, Walker, Borona, Boric, Ronan and Martinez, under the totality of circumstances, negligently caused the death of Plaintiff's Decedent.

119. The aforementioned negligent actions on the part of the Defendants Amato, Walker, Borona, Borrico, Ronan and Martinez, which enhanced the risk deadly force would be used is contrary to good police procedure, created a danger to themselves and the public, including Ms. Davis and Plaintiff's Decedent and by that negligent conduct caused foreseeable harm to Plaintiff's Decedent.

120. As a direct and proximate result of these aforementioned negligent actions on the part of the Defendants Amato, Walker, Borona, Borrico, Ronan and Martinez, the Plaintiffs' Decedent, Carnell Williams, was shot and killed by Defendants Borona, Borrico, Walker and Ronan.

121-125. Paragraphs 121 through 125 of the First Count are incorporated by reference as though fully stated herein and hereby becomes Paragraphs 121-125 of this count.

126. As a result of Defendant's negligent conduct, the Plaintiff's Decedent

suffered damages, as set forth herein.

**FIFTH COUNT**

**NEGLIGENT SUPERVISION (AGAINST CHIEF GAUDETT)**

1-126. Paragraphs 1 through 126 of the Fourth Count are hereby incorporated by reference as Paragraphs 1-126 of this Count as though fully set forth herein.

127. Defendant Gaudett knew or should have known that Defendants Amato, Walker, Borona, Borrico, Ronan and Martinez had a proclivity for engaging in reckless, violent, and/or irresponsible conduct as a police officer.

128. Defendant Gaudett had a duty to protect Plaintiff's Decedent from the tortious acts of Defendants Amato, Walker, Borona, Borrico, Ronan and Martinez..

129. In addition, Defendant Police Chief Gaudett has had a general policy, pattern and/or practice of not disciplining police officers for their misconduct, thereby sanctioning the police officers' actions, which amounted to a departmental policy of overlooking constitutional violations and deliberate untruthfulness.

130. Even if Defendant Gaudett's practice of overlooking police misconduct and constitutional torts was not authorized by an officially adopted policy, the practice was so

common and well settled that it represents official policy. See, Board of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404 (1997).

131. The formal and informal actions of Defendant Gaudett in overlooking, hiding, and/or tacitly encouraging police misconduct by his officers, including Defendants Amato, Borona, Borrico, Ronan, Walker and Martinez, reflect a policy, practice, custom and procedure negligently authorizing and allowing the excessive use of force and deliberate deception both of which resulted in the use of deadly force against Plaintiff's Decedent.

132. Defendant Chief Gaudett negligently supervised Defendants Amato, Walker, Borona, Borrico, Ronan and Martinez because he sanctioned the following customs, practices and policies:

(A) Using excessive force when it is not necessary or permitted by law;

(B) Using deadly force when such force is not necessary or permitted by law;

( C) Ignoring the serious need for ongoing training and supervising its officers in regard to the use of force, particularly once those officers have used deadly force already;

(D) Failing to discipline those persons whom are found to have engaged

in the use of excessive force upon those entrusted to their care or under their control;

(E) Failing adequately to supervise and observe its officers;

(F) Failing adequately to train officers regarding the availability of alternative means of detaining persons other than the use of deadly force;

(G) Failing to discharge officers who have shown a pattern or practice of using excessive force;

(H) Failing adequately to train and supervise officers as to the proper procedures to use in undercover operations;

(I) Failing to discharge officers who have shown a pattern or practice of untruthfulness, where such untruthfulness violates the civil rights of others or is intended to cover up that officer's improper or illegal actions or unlawfully influence the outcome of an investigation;

(J) Adopting a practice whereby officers who are unfit for peace officer duties, as shown by prior actions in the line of duty, are allowed to retain their positions;

(K) Failing to ensure that police incident reports contain all material information and that police officers do not intentionally fail to disclose facts that place that officer in a bad light, when any reasonable person would consider such omissions as conscious-shocking misconduct.

(L) Failing to ensure that officers involved in Gang Task force assignments utilize the proper methods for undercover sting operations, including but not limited to: (1) having sufficient time to plan an operation safely for the public as well as the officers and suspects to avoid altogether or minimize use of force; (2) having sufficient time to brief all officers to be involved in the undercover operation; (3) ensuring that any police officer then under investigation for the use of deadly force is not involved in such undercover operations; (4) ensuring there is a fail-safe signal to call off the undercover operation if circumstances change such as to put police officers or the public at greater and unnecessary risk; (5) ensuring that if the undercover operation involves the purchase of

firearms, that the firearms are purchased and secured by the undercover officer before the team moves in for any arrest; (6) ensuring that such operations do not take place in public areas that unnecessarily put the community at risk.

(M) Allowing police officers involved in the use of deadly force to conspire with each other before presenting each individual account of the incident by way of letters to Captain Viadero weeks after the demise of Carnell Williams, and failing thereafter to question officers as to any discrepancies or all too convenient consistencies at odds with other reports or evidence.

(N) Having been on notice since May of 2008 that Defendant Borona had deliberately lied and concealed exculpatory information in violation of Christopher Russo's constitutional rights, and thereafter having been on notice as to the discrepancies between Borona's letter to Chief Viadero describing his use of deadly force against Bryan Stukes and the videotape footage of the event, as well as the later recovery of another bullet in addition to the two casings earlier

recovered that forensic science confirmed had been fired from Borona's service weapon, necessitating that Borona had placed a hollow point bullet into the chamber of his service weapon prior to surrendering that weapon intentionally to conceal that he had fired three shots at Stukes not the two that Borona claimed, allowing Defendant Borona to again report his involvement in the use of deadly force against Carnell Williams weeks after the event by way of a letter to Captain Viadero without any further and detailed inquiry.

133. At the time Defendants Borona, Borrico, Ronan and Walker shot and killed Plaintiff's Decedent, Carnell Williams, just days after his twenty-third birthday, and Defendants Amato and Martinez were part of an undercover gun buy that intentionally failed to secure firearms for sale before the police moved in for the arrest, they were acting pursuant to Defendant Gaudett's city policy, practice, custom and procedure negligently overlooking and/or authorizing police officer's excessive use of force.

134. Defendant Gaudett's policy, custom and practice of negligently overlooking and covering up police brutality and untruthfulness was a direct cause of the death of Carnell Williams, Plaintiff's Decedent.

135. Defendant Gaudett negligently supervised and failed to retrain police officers who had engaged in misconduct so egregious that Defendant Gaudett had clear warning that such officers posed a danger to citizens; liability applies because the need for additional or different training was obvious as to Defendants Amato, Borona and Borrico for being outliers in the use of deadly force in Bridgeport since 2004 as Defendant Amato was involved in three of seven uses of deadly force and Defendants Borona and Borrico were each involved in two of seven uses of deadly force and Defendant Borona had materially lied, costing the city the sum of $250,000 in damages.

136. Defendant Gaudett's acts and omissions, when viewed objectively, involved a negligent degree of risk, considering the probability and magnitude of harm to others. Defendant Gaudett had actual, subjective awareness of the risks involved, but nevertheless proceeded with negligent indifference to the rights, safety, or welfare of others, including Plaintiff's Decedent.

137. In view of the known risk posed by Defendant Borona to engage in deliberate deception in violation of a person's constitutional rights, which misconduct shocks the conscience, and the risks posed by Defendants Amato, Borona and Borrico as to the prior use of deadly force, Defendant Chief Gaudett's failure to provide

additional training and supervision to these Defendants constitutes negligence and/or negligent indifference to the rights, safety and welfare of others, including Plaintiff's Decedent.

138. After the deaths of Bryan Stukes in April of 2013 and Carnell Williams in November of 2013 from the use of deadly force, both of which involved Defendant Borona within a seven month period, and the latter of which represented the second use of deadly force by Defendant Borrico and the third involvement of Defendant Amato in a use of deadly force since 2004, Defendant Gaudett sent a police lieutenant and two city attorneys in December 2013 to a three day conference focused on the latest and best practices in use of force policies. Information from that conference purportedly led the department to review policies to help improve record keeping.

139. Although an outcome from that conference was that Defendant Gaudett claimed that the command staff was constantly reviewing polices for the betterment of the department, including conducting periodic reviews of all use-of-force reports and investigations to ensure that they are thorough and complete, upon information and belief Defendant Gaudett negligently failed to conduct a review of the use of deadly force by Defendant Borona in the Stukes matter against the video footage or in the use of

deadly force against Plaintiff's decedent.

140. Defendant Gaudett negligently failed to conduct such a review of the use of deadly force reports in Stukes and Carnell because such review would have revealed that Defendant Gaudett should have known his inadequate supervision was likely to result in the alleged deprivations so as to constitute negligence and that there was a causal relationship between his negligent failure to supervise and the death by police use of deadly force suffered by Plaintiff's Decedent.

141. Defendant Gaudett negligently failed to conduct such a review of the use of deadly force reports in Stukes and Carnell because he knew that such review would reveal that Department officers were in some way predisposed to unconstitutional action against minorities and such predisposition was known, or should have been known, to the supervisory personnel, including himself, who did not act to counter it.

142. Defendant Gaudett negligently failed to conduct such a review of the use of deadly force reports in Stukes and Carnell because he knew that such review would reveal that line officers knew that they could engage in an abuse of rights involving minorities without rising appropriate disciplinary consequences.

## SIXTH COUNT

**INDEMNIFICATION PURSUANT TO GEN. STAT. § 52-557n(a)(1)**
**(AGAINST THE CITY OF BRIDGEPORT)**

1-126. Paragraphs 1 through 126 of the Fourth Count are incorporated by reference as though fully stated herein and hereby become Paragraphs 1 through 125 of this count.

127-142 Paragraphs 127 through 142 of the Fifth Count are incorporated by reference as though fully stated herein and hereby become Paragraphs 127 through 142 of this count.

143. Pursuant to General Statutes § 52-557n(a)(1)(A), the Defendant, City of Bridgeport, is liable for the aforementioned negligent acts or omissions of Defendants Gaudett, Amato, Walker, Borona, Borrico, Ronan and Martinez, and the injuries, wrongful death and damages suffered by Plaintiff's Decedent and the Estate of Carnell Williams resulting therefrom.

## SEVENTH COUNT

**INDEMNIFICATION PURSUANT TO GEN. STAT. § 7-465**
**(AGAINST THE CITY OF BRIDGEPORT)**

1-126. Paragraphs 1 through 126 of the Fourth Count are incorporated by reference as though fully stated herein and hereby become Paragraphs 1 through 126 of this count.

127-142. Paragraphs 127 through 142 of the Fifth Count are incorporated by reference as though fully stated herein and hereby become Paragraphs 127 through 142 of this count.

143. Pursuant to Connecticut General Statutes § 7-465, the Defendant, City of Bridgeport, is liable for the aforementioned negligent actions of Defendants Gaudett, Amato, Walker, Borona, Borrico, Ronan and Martinez, and the injuries and damages to Plaintiff Decedent and the Estate of Carnell Williams, resulting therefrom, and is obligated to indemnify said Defendant police officers for any judgment rendered thereupon.

## DEMAND FOR RELIEF

**WHEREFORE**, the plaintiff claims:

1. Actual, compensatory and just damages;

2. Punitive damages;

3. Attorneys' fees pursuant to Section 1983 and 1988; and

4.. Such other legal and equitable relief as the Court deems just and proper.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS**

THE PLAINTIFF,

s/Michael Stratton
By________________________

Michael Stratton
Stratton Trial, LLC
117 River Street
Milford, Connecticut 06460
Telephone: (203)266.1300
Juris No. 402807
Email: mike@strattontrial.com

**CERTIFICATION**

I hereby certify that on September 12, 2016 a copy of the foregoing notice and amended complaint were served by mail on anyone unable to accept electronic filing. Notice to all other parties occurred through operation of their Court's electronic filing system. Parties may access these filings through the Court's PACER system.

s/Michael Stratton
By________________________

Michael Stratton
Stratton Trial, LLC
117 River Street
Milford, Connecticut 06460
Telephone: (203)266.1300
Juris No. 402807
Email: mike@strattontrial.com